# UNITED STATES DISTRICT COURT

## DISTRICT OF NEVADA

Jaysen Alexander Patterson,

     Petitioner

v.

Brian Williams,[1] et al.,

     Respondents

Case No.: 2:20-cv-01614-JAD-DJA

**Order Denying Petition for Writ of Habeas Corpus**

[ECF No. 16]

      In 2015, Petitioner Jaysen Alexander Patterson pled guilty to arson and three counts of burglary and was sentenced to four consecutive terms of 6 to 15 years imprisonment, for an aggregate term of 24 to 60 years.[2]  Patterson seeks a writ of habeas corpus under 28 U.S.C. § 2254 on three grounds: (1) ineffective assistance of trial counsel during sentencing; (2) denial of due process through bias of the sentencing judge; and (3) ineffective assistance of counsel by allowing references to Patterson's juvenile history to remain in a confidential mental-health evaluation.[3]  I previously dismissed ground two as procedurally barred.  And while I found that ground one was also procedurally defaulted, I deferred ruling on that claim to allow the parties to brief whether Patterson could overcome that procedural default.[4]  With the benefit of that additional briefing, I now hold that Patterson has shown cause and prejudice sufficient to overcome a portion of ground one's procedural default, but I deny that portion on the merits and

---

[1] The state corrections department's inmate-locator page states that Patterson is incarcerated at High Desert State Prison.  The department's website reflects that Brian Williams is the warden for that facility.  *See HDSP_Facility (nv.gov)*.  I therefore direct the Clerk of the Court to substitute Brian Williams for Respondent Calvin Johnson under Fed. R. Civ. P. 25(d).

[2] ECF No. 11-1.

[3] ECF No. 16.

[4] ECF No. 53.

find that Patterson cannot overcome default on the remainder of ground one.  I also deny ground three on its merits.  But because reasonable jurists may disagree, I grant Patterson a certificate of appealability.

**Background**

**A.     The facts underlying Patterson's convictions**[5]

   *1.     Arson*

At around 3:00 A.M. on a Friday morning in November of 2014, the fire department in Sparks, Nevada, responded to a fire at the home of Marlene and Gary Drew.  The Drews awoke to a "popping sound" and saw "flames issuing" from their garage windows.  The fire and smoke and the water used to douse the flames damaged the Drews' garage, garage attic, utility room, four vehicles, furniture, and various electronics.  The insurance adjuster estimated the damage at approximately $180,000.  Losses not recoverable through insurance were itemized at more than $23,000.00.  The Drews were displaced from their home for construction repairs for nearly a year, and the fire department told them that "they were 10 minutes from death" had they not escaped when they did.  Patterson admitted to the police that he burglarized the Drews' garage and, after taking the last of the stolen items to his vehicle, he returned and set the garage on fire to cover up the crime.  Police recovered some of the tools that Patterson stole from the Drews' garage.[6]

   *2.     Three burglaries*

The Drews' home was not Patterson's only theft that autumn.  On October 29, 2014, Roy Hykes reported to police that someone entered his unlocked truck, used his garage-door opener

---

[5] These facts are taken from the presentence-investigative report and guilty-plea memorandum.
[6] ECF No. 27-1 at 6–8; ECF No. 37-14.

to enter his garage, and stole a five-foot-tall gun safe containing four rifles and three pistols. Patterson admitted to the police that he sold one of Hykes's rifles.[7]  A month after the Hykes hit, Robert Burrows reported to police that his garage-door opener, Glock-17 handgun, 100 rounds of 9mm ammunition, and hunting clothing inside a duffel bag were stolen from his vehicle.  Police recovered Burrows's firearm in the possession of one of Patterson's co-offenders, who informed police that Patterson sold it to him.  Patterson admitted to police that he stole the firearm from Burrows.[8]  The same day, Scott Porvilly reported that hunting rifles, optics, and a wedding ring were stolen from his vehicle.  Patterson admitted that he stole the firearms, binoculars, and a scope, but denied taking the wedding ring.  Police recovered the stolen firearms during the execution of a search warrant at the residence of one of Patterson's co-offenders.[9]

**B.      Patterson's guilty plea**

In March 2015, Patterson signed a guilty-plea memorandum in which he admitted to first-degree arson and three counts of burglary for the crimes against Hykes, Burrows, Porvilly, and the Drews.  In exchange for Patterson's guilty plea, the state agreed not to "file additional criminal charges resulting from the arrest."  Patterson agreed to make full restitution for the crimes to which he pled guilty and for 19 uncharged ones that the state wouldn't pursue in exchange for his plea.  He agreed that "any counts [that] are to be dismissed[,] and any other cases charged or uncharged which are either to be dismissed or not pursued by the state, may be considered by the court at the time of sentencing."  He attested that he and his counsel discussed

---

[7] ECF No. 27-1 at 6; ECF No. 37-14 at 3–4.

[8] ECF No. 27-1 at 6–7; ECF No. 37-14 at 4.

[9] ECF No. 27-1 at 7; ECF No. 37-14 at 4.

1  "the facts and . . . possible defenses," he understood the state was free to argue for an appropriate

2  sentence, and he knew he was "not promised" a specific sentence.[10]

3        At the change-of-plea hearing, Patterson pled guilty in accordance with the terms of the

4  plea memorandum and acknowledged in open court that he understood he could be sentenced to

5  2 to 15 years for each conviction and that each of those sentences could run consecutively or

6  concurrently.  He also acknowledged that "[t]he Court does not have to follow any plea bargain

7  or any sentencing recommendation the attorneys might make" at sentencing and, "at the end of

8  the day it will be . . . the judge that decides" his sentence based on the "sentencing parameters

9  explained to him."  The state confirmed that it agreed to dismiss the remaining charges and not

10  file additional charges resulting from Patterson's arrest.[11]

11  **C.**   **Sentencing**

12       *1.*   *Patterson's presentence investigative report*

13        A presentence-investigative report (PSI) for Patterson was prepared for sentencing.  It

14  reports that Patterson was imprisoned for felony escape from juvenile detention in 2011.  The

15  PSI notes that, on the date of his arrest for this case, Patterson sent a text message to his live-in

16  girlfriend, directing her to throw all of the stolen property he had at their apartment into a

17  dumpster.  The PSI listed several of Patterson's tattoos as identifiers, including a black raven

18  over his heart; a demon with a pentagram and "Despair" on his left arm; "Death," a circle with

19  pitchfork, and goats with pitchforks on his right arm; five moons on his right ribs; fifteen stars on

20  his left ribs; the anarchy symbol on his left leg; a "skull with 4 cards" on his right leg; and the

21

22

23  [10] ECF No. 37-14.

[11] ECF No. 37-13 at 5–18.

4

Cancer symbol on his left shoulder.[12]  For the arson conviction, the PSI recommended a prison term of 6 to 15 years.  For the three burglaries, it recommended 35 to 156 months for Count 2 (to run consecutive to the arson sentence); a concurrent term of 35 to 156 months for Count 3; and 35 to 156 months for Count 4 (to run consecutive to Count 3).[13]

**2.      *The prosecution's arguments and exhibits at sentencing***

**a.      *Patterson's crimes and lack of remorse***

The state requested an aggregate sentence of 14 years and 8 months to 54 years of incarceration, including 6 to 15 years for the arson conviction, plus 35 to 156 months for each of the burglaries.  It argued that Patterson had committed 14 infractions when he was imprisoned for his felony escape.  Within months of his release from prison, he went on a carefully planned burglary spree at 19 residences from early September until a co-offender reported him and he was caught by police.  Patterson's M.O. was to enter vehicles parked in driveways in the early morning hours while people were asleep, take the garage-door openers, open the garage doors, leave for 10 to 15 minutes, return to see if anyone was awakened by the opening of the garage doors, and then burglarize the garages.  Patterson admitted that he stole firearms, credit cards, tools, and electronics, and he "put guns on the street."[14]

The state argued that Patterson "kn[ew] the danger and risk [that] his conduct posed."  It presented evidence showing that Patterson told police detectives that he had not committed arson since he was a juvenile and he "[w]ouldn't do that because there could be kids in the house," but he eventually admitted to lighting the Drews' garage on fire.  He also acknowledged that, based

---

[12] ECF No. 27-1 at 3 (cleaned up).

[13] *Id.* at 9–10.

[14] ECF No. 37-20 at 45–56.

on the number of cars parked in front of the Drew residence and in their garage, he knew that

there had to be people home at that early hour of the morning.  Patterson told a detective that he

nevertheless stole items from the Drews' garage, retrieved a gasoline can from his vehicle,

poured the gasoline in the Drews' garage, and lit the fire, even though it was apparent that people

were likely home.  The state also presented evidence that Patterson used a police scanner when

setting fire to the Drews' garage, so he likely knew that the fire was blazing for at least ten

minutes before someone called it in, but "[h]e just left it to burn.  He left it to threaten not only

the property but the lives of the two residents in that house."  The state argued that Patterson's

acknowledgement that he knew people were home proved that he acted maliciously and was

motivated by "the thrill of setting the fires, and the self-interest."

The state also presented evidence from one of Patterson's uncharged cases showing that

he "poured probably diesel fuel . . . on a floor of a house under construction" while "nobody was

living there" and tried to "set that structure on fire" by firing a stolen gun "twice onto the floor

area where the diesel fuel was in an attempt to combust it, but it did not."  The state argued that

Patterson in another case burglarized a truck parked in a driveway and set the truck on fire.[15]

The state acknowledged that Patterson cooperated with police in solving the crimes and

retrieving stolen property, but only after he realized that his co-offender had dropped a dime on

him.  The state argued that, although Patterson provided "more than [the police] probably could

have proved without his admission," the video recordings of Patterson's statements show that his

cooperation was "motivated by self-interest."

---

[15] *Id.* at 48–50, 53, 59–60.

   **b.** *Patterson's jail conversations suggesting fabrication of substance-abuse and mental-health problems*

  The state also submitted portions of video and audio recordings of Patterson's conversations with his girlfriend and her mother that it argued show that Patterson fabricated a methamphetamine problem and mental-health issues to obtain a favorable probation-and-treatment sentence.[16]  In those recordings, Patterson told his girlfriend, "[I] made myself look crazy.  [Defendant laughs] I told them I was smoking meth and hearing voices and . . . that's what I told them.  I wasn't doing that, but . . ."  He further told his girlfriend and her mother, "Well the good thing is I've got the whole drug thing on my side.  If they see I committed my crimes [because] of a drug problem, then they're going to try to find me rehab instead [of a prison sentence]."  In a jail call to his girlfriend's mother, Patterson admitted to drinking and using marijuana but said, "I would never touch that other shit, ever."[17]

  The state argued that Patterson made several statements to his girlfriend and her mother that supported the conclusion that he fabricated mental-health and substance-abuse issues:

    [Y]ou might hear some things in court that you're not going to
    believe that I don't want you believe . . . I'm pretty sure you kinda
    know what I'm going have to and all that stuff . . . A lot of it is
    going to have to do with, like drug use.  I'm going to have to admit
    to some of that in order to get treatment. . . .

    [T]hat's why I told you there's going to be some things you're
    gonna hear that you're not gonna want to believe that you're not
    supposed to believe to . . . I think you kinda get it, so.  I think you
    know what I'm going have to do. . . .

    [B]ack when I was saying about the treatment thing, the reason
    why is because they have to diagnose me with something, whether
    it's bipolar, you know, stuff like that.  So if they don't, if they can't

---

[16] ECF No. 37-17 at 8–9.

[17] *Id.* at 8–12.

> diagnose me with anything, then I don't get treatment, so I have to kinda convince them to diagnose me with something. . . .
>
> [I]'m going to have to play my cards right with the courts, try to get into treatment . . . they'll probably end up putting me on medication I'm not gonna need . . . .
>
> [N]o, like, they'll probably put me on bipolar medication, 'cause that's what I'm going to try to aim for . . . they're looking for a reason *why* I was going out and doing this.  If I told them, Oh, I just did it to go get money then they're going to look at me as a criminal.  If I tell them Oh, I was doing it to support a drug habit, then they're going to be like, OK, well, this guy needs help, get him into treatment. . . .
>
> [I]'m gonna try to get into mental health court, which I'll probably maybe do an in-house treatment for, it depends, anywhere from 90 days to a year, but it beats doing, it beats doing a couple years in prison . . . .  So we got to go for treatment.[18]

Patterson also told his girlfriend and her mother that his judge is a "big program judge" and if he was allowed to live with his girlfriend's mother as part of a program or while on parole, her mother would have to hide drugs and firearms for a day.[19]

The state pointed to excerpts from Patterson's interview with Washoe County Sheriff detectives in which Patterson said that he was "looking 'for treatment instead of imprisonment.'" His statement prompted the detective to ask Patterson if he had a drug problem, but Patterson responded, "I just think I have a theft problem."  The state argued that Patterson told detectives that he committed the burglaries "to make a profit" because he had to pay bills.  He did not mention that he stole things to pay for meth.[20]

---

[18] *Id.*

[19] *Id.* at 10–12.

[20] *Id.* at 7–8.

The state argued that Patterson "wiped away" much of his mitigation efforts by falsely attempting to convince evaluators, the court, and his lawyer that he needed treatment and was committing the crimes to feed a drug problem.  It pointed to excerpts of the video and audio recordings from Patterson's conversations with his girlfriend and her mother to suggest that he was merely creating a rouse to get less prison time.  The state argued that Patterson had multiple opportunities during interviews with law enforcement to tell police that he used drugs and heard voices but did not.  The state also emphasized that Patterson's crime spree occurred "every single night" for weeks and that his statements of remorse lacked credibility.[21]

### 3.    The defense's arguments and exhibits at sentencing

The defense submitted mitigation evidence at sentencing, including: (1) a psychological evaluation by Nevada psychologist Dr. Debbie Fletcher; (2) a substance-abuse evaluation by Janice Fung, MA, LADC; (3) a letter confirming Patterson's admission to The Salvation Army's Northern Nevada Adult Rehabilitation Program; (4) two letters from Patterson; and (5) a letter confirming that Patterson participated in voluntary alcohol-and-drug treatment programs at the Washoe County Detention Center.[22]  Defense counsel primarily argued that Patterson was struggling with a meth addiction when he committed the crimes, accepted responsibility for his actions, and cooperated with the investigations and helped the police track down much of the stolen property.

#### a.    Mental-health and substance-abuse evaluations

Dr. Fletcher's mental-health evaluation states that Patterson was 22-years old at the time of the evaluation.  He reported taking Adderall and Ritalin for attention-deficit hyperactivity

---

[21] *Id.* at 50–63.

[22] ECF No. 27-2; ECF No. 34-1–34-4; ECF No. 37-18; ECF No. 37-20 at 17–18.  A rejection letter from the mental-health court was also filed.  ECF No. 37-20 at 18.

1  disorder between the ages of 5 and 11.  He stopped taking the medications because they made

2  him "worse" and he was unsure whether he actually had the disorder.  Patterson told Dr. Fletcher

3  that he was previously diagnosed with conduct disorder.  He reported "auditory hallucinations

4  when under the influence of methamphetamine but none otherwise."  Patterson "openly

5  admitted" that he engaged in illegal and impulsive activities as a youth that placed him "and

6  others in dangerous situations."  He reported that he was arrested several times when he was a

7  juvenile, "including twice for arson, possession of [a] stolen motor vehicle, and theft."  The

8  report states that Patterson "[w]as repeatedly remanded to juvenile detention and served two

9  sentences at Nevada Youth Training Center."  Patterson told Fletcher that he was assessed for the

10  gifted-and-talented program and earned a 3.7 grade-point average in juvenile detention.  When

11  Patterson escaped from juvenile detention, he was sentenced to prison for 4 years and released in

12  May of 2014.  Fletcher's evaluation concludes:

13            Based on historical information [Patterson] provided along with his
          clinical presentation, [Patterson] appears to meet DSM-V
14            [Diagnostic and Statistical Manual of Mental Disorders, Fifth
          Edition] criteria for Alcohol, Cannabis, and Stimulant Use
15            Disorders; Unspecified Disruptive, Impulse-Control and Conduct
          Disorder; Attention-Deficit Hyperactivity Disorder by history; and
16            Rule Out Antisocial Personality Disorder.[23]

17        Fung's substance-abuse evaluation states that Patterson reported that he lit the Drews'

18  garage on fire because he was using methamphetamine and "hearing voices and feeling

19  paranoid."  Fung concluded: "Based upon the information presented, Jaysen meets the criteria

20  specified in the DSM-IV (Diagnostic and Statistical Manual of Mental Disorders, Fourth

21

22

23

_____

[23] ECF No. 34-3 at 3–5.

Edition) for Amphetamine (Methamphetamine) Dependence, Alcohol Dependence and Cannabis Dependence . . . ."[24]

### b.   Defense counsel's arguments at sentencing

At the sentencing hearing, defense counsel argued that Patterson understood he was going to prison for his crimes and requested an aggregate prison term of 8 to 20 years, including 6 to 15 years for the arson conviction.  Counsel pointed out that Patterson had participated in ROTC and graduated from high school but "started getting into trouble" and went to prison for escaping from juvenile detention.  Counsel discussed Patterson's estrangement from his parents and his close relationship with his grandmother.  He noted Patterson's unsuccessful attempts to attend paramedic school and gain employment sufficient to support himself, his girlfriend, and her son after his release from prison in 2014.  Counsel explained that Patterson's girlfriend broke up with him and his grandmother died soon after his release, arguing that his crimes were triggered because Patterson coped with those losses by drinking alcohol and using methamphetamine.

Counsel emphasized that Patterson was amenable to substance-abuse treatment and he made positive changes by seeking employment and drug treatment and acting as a father to his girlfriend's son.  Counsel argued that Patterson cooperated by confessing to multiple burglaries and led police to recover tens of thousands of dollars in stolen property.  Patterson also took responsibility by waiving his preliminary hearing and pleading guilty to "the four most serious" crimes.[25]  Counsel explained that Patterson's comments to his girlfriend about mental health and substance abuse were made to let her down easy because she did not understand the gravity of

---

[24] ECF No. 34-4 at 4–5.

[25] ECF No. 37-20 at 18–29, 30, 44–45.

his situation.  The sentencing judge questioned defense counsel about Patterson's juvenile arson charges, and counsel responded that they occurred when Patterson "was a lot younger.  It was a truck out in [the] desert.  Just an abandoned thing that was there.  But those were when he was younger, maybe 13 years old."[26]

### 4.     *Patterson's allocution*

Patterson read one of the two letters he wrote for sentencing in open court, in which he explained his activities after his 2014 release from prison.  He said that he attempted to "start moving forward" with his life and was employed at Goodwill and Kohl's, but he could not make ends meet on the limited income.  He described his efforts to make money and the challenges he encountered with his girlfriend, a roommate, and his residential circumstances.  He explained that his girlfriend broke up with him, and then his grandmother (who was his primary emotional support) died in September of 2014.  He said he coped with the losses by using drugs and alcohol and committed the crimes to support his needs and substance abuse.  He added that, by November of 2014, he "started looking at the bigger picture" and how he was affecting other people.  He got a job at Auto Zone and reconciled with his girlfriend, but he was arrested a day later.[27]

Patterson confirmed that he cooperated fully with police to get the stolen property returned to its owners.  He said, "I wanted to right my wrongs, so anything I had that didn't belong to me I told them that's where the property actually belonged," and he was "glad to say [that] a lot of people had their property returned to them."  He acknowledged that some things could not be fixed or replaced, including the "emotional trauma" caused by his actions.  He

---

[26] *Id.* at 19–21.

[27] *Id.* at 31–38.

expressed that the victims of his crimes "did not deserve to have their hard-earned property taken from them" and he was remorseful that he took away their "sense of security."  He wished to make "amends" in any way necessary.[28]

Patterson said he regretted his crimes against the Drews "because of the pain" his actions caused them, and he did not merely regret "where it put" him.  He never intended to harm the Drews, and the "death of anybody was not a thought" in his mind.  He said he had gasoline in his truck because he once ran out of gas four-wheeling in the mountains.  He claimed that, during the robbery, he panicked when he discovered "a broken latex glove" and started the fire in an attempt "to erase" his fingerprints.  Patterson apologized directly to Mr. and Mrs. Drew, admitted that there was "no excuse" for his actions, and agreed that he deserved to go to prison.  He asked the court to consider his counsel's sentencing recommendation.[29]

### 5. *Victim-impact statements*

The Drews testified at Patterson's sentencing hearing.  Mrs. Drew recounted that she awoke on the night of the fire to the sounds of breaking glass, a car alarm, and exploding boxes of ammunition.  She smelled smoke and saw "flames outside the side windows of the garage." She said her heart "was pounding" and her "body was shaking uncontrollably."  An investigator from the Sparks Fire Department told the Drews that, had they slept another ten minutes, they would have succumbed to deadly levels of carbon monoxide that filled their house.  Mr. Drew testified that the fire started to spread to the house's attic, requiring firemen to "punch holes in the ceiling of the living room to prevent the fire from continuing to damage the house, noting

---

[28] *Id.* at 38–39.

[29] *Id.* at 39–41.

13

that the flames would have "come into the house completely" had it burned for a few more minutes.

The smoke and water damage was extensive, and Mr. Drew testified that "all of the carpeting had to be removed" and the floor replaced.   He explained that the heat from the garage destroyed "all the stucco," filled "the house with smoke and toxic gases," and ruined their bedroom furniture and all the "soft-sided furniture in the rest of the house."  The Drews also had to replace "half the wiring and plumbing system, as well as the whole heating system" and they could not return to their home until September 2015.[30]  Mr. Drew said the fire-damage loss was "like $300,000 or more."  Four vehicles were destroyed: a Fusion, a Grand Cherokee, a '95 convertible Mustang, and a 64 ½ Mustang convertible.  It also "destroyed our three-car garage [and] all of the tools and personal items" he had "accumulated over 45 years."  The Drews had to replace electronic equipment, including five computers, three televisions, a stereo system, and "all of the other little devices we had."  Mr. Drew said that insurance would cover most of the damage but would not replace the classic cars.[31]

Mrs. Drew testified that, after this experience, she participated in counseling and took medication for post-traumatic stress disorder, anxiety, insomnia, irritability, and difficulty concentrating.  She remarked that "[t]here's no excusing that they at least had to assume with two cars in the driveway at approximately 2:30 on a Friday morning that someone may have been in that house.  Yet they continued using accelerant they brought with them" and left after igniting the fire.  Although Patterson was not charged with attempted murder, she said that she and her husband "honestly believe that Mr. Patterson knew exactly what he intended to do . . .

---

[30] *Id.* at 73–75.

[31] *Id.* at 71, 75–76.

and it wasn't burglary." She expressed that their lives were "forever" changed and asked for "the maximum sentence allowed by law."[32]

Mr. Drew testified that he believed Patterson should have been charged with attempted murder, and he expressed his view that Patterson is a "sociopath":

> For Mr. Patterson, I still believe he should have been charged with two counts of attempted murder, because I believe he was hoping that someone would die that morning. The DA has tried a number of times to explain how the law works in this matter. But when I tell anyone what happened, they always ask, they are being charged with attempted murder, aren't they? You begin to wonder if the law isn't wrong.
>
> Mr. Patterson is a selfish, inconsiderate person who didn't care about the consequences of his actions. In essence, a sociopath. And I believe if he isn't locked up for a considerable length of time, he will eventually escalate his actions until he does kill someone.[33]

### 6.  The judge's remarks and pronouncement of sentence

The sentencing judge stated that she "considered the sentencing arguments," the exhibits in evidence, "all the mitigating factors," and the aggravating factors. She addressed Patterson:

> As to you, Mr. Patterson, I think your tattoos sum up the type of person you are. On Page 2 of the presentence investigation you have a black raven over your heart. Your left arm is a demon with a pentagram circle and despair. On your right arm death[,] circle with a pitchfork, goat [with] a pitchfork. On your left leg[,] an anarchy sign. On the right[,] a skull with four cards.
>
> I have been doing this job for over 20 years. And you, sir, appear to be a sociopath. You appear to be a person who has no conscience whatsoever. None. None.
>
> You are extremely intelligent. You had clearly the ability, and had the ability to be successful, but unfortunately you do not have a soul or a conscience.

---

[32] *Id.* at 64–69.

[33] *Id.* at 80.

You like to set fires.  You like to put people like the Drews at risk.
You enjoy anarchy, and you have no remorse.  That's what it
appears to the Court.

It's truly unfortunate because you write well, you are articulate.
I'm sure you're charming, likable, get your buddies to burglarize
homes.  But you like to put the cherry on the top.  You want to
light things on fire.

And there could be kids in there.  Could have been animals.  And I
understand the Drews' concern.  Why isn't this attempted murder?
You put firefighters at risk.  First responders who have to go in,
who have to get up by those firewalls, and then maybe they drop
through the ceiling, and they burn to death.

That's what you do.  And you did it over and over again.  And then
you put guns on the street.  You do not have a soul in this Court's
opinion.  And you are the most dangerous of the dangerous, and
you deserve the maximum sentence because you shouldn't be out
among society, because this is the type of criminal that you are.

I've considered all the mitigating factors, but likewise, I've
considered the aggravating.  And based upon the nature of this
crime, the nature of your crime spree, you warrant maximum
sentences as to all counts.[34]

The judge then imposed the maximum allowable sentence of four consecutive terms of 6

to 15 years imprisonment, for an aggregate term of imprisonment of 24 to 60 years.  She also

said that she would submit the defense evaluations, the state's sentencing memorandum, the

recordings of Patterson's statements that were admitted into evidence at sentencing, and the PSI

to the parole board.  The judge stated that she would make "an affirmative recommendation that

the director of prisons educate himself about Mr. Patterson's manipulative behavior as it relates

to his allegations in those evaluations so that the parole board and the direct of prisons has a

complete picture of who Mr. Patterson really is."[35]

---

[34] ECF No. 37-20 at 8–83.

[35] *Id.* at 83–85.

The judge then addressed Patterson a second time:

> Again, Mr. Patterson, in my excess of 20 years as a judge I've had three arson cases. One of them was a serial murderer. The other one was a person who was in a conflict with somebody else. And arson is an extraordinarily unusual crime, and it involves extremely dangerous and unusual people. So I encourage you to get the treatment you need to understand that anarchy and setting people's homes on fire is the most heinous of crimes and should be up there with murder. Good luck to you.[36]

## D.    Patterson's sentence is affirmed on direct appeal.

On appeal, Patterson argued that the sentencing judge abused her discretion by interpreting his tattoos to characterize him as a sociopath because no evidence or expert testimony supported that diagnosis.[37] The Nevada Court of Appeals held that the judge did not rely solely upon impalpable evidence, did not close her mind to the presentation of all evidence, and did not refuse to consider mitigating evidence:

> Appellant Jaysen Patterson claims the district court abused its discretion at sentencing by reading the presentence investigation report's description of his tattoos and concluding they appear to show he is a sociopath. Quoting from *Norwood v. State*, 112 Nev. 436, 440, 915 P.2d 277, 279 (1996), Patterson argues the court's "declaration that [he] was a sociopath was made 'not with reliance on highly dubious or inflammatory evidence, but without reliance on *any* supporting evidence whatsoever.'"
>
> The record belies Patterson's argument. It shows the district court received evidence that Patterson repetitively burglarized cars and garages without concern for the victims. During one of his burglaries, Patterson set the Drew Family's garage on fire with an accelerant he had brought for that purpose. Patterson knew, by the time of night and the presence of vehicles in the driveway and garage, there were people asleep inside the house. But he did nothing to warn these people of the impending danger. Gary Drew stated that Patterson "is a selfish, inconsiderate person who didn't

---

[36] *Id.*

[37] ECF No. 38-12 at 6–9.

17

care about the consequences of his actions.  In essence, a
sociopath.  And I believe if he isn't locked up for a considerable
length of time, he will eventually escalate his actions until he does
kill someone." The court apparently agreed.

Patterson has not demonstrated the district court relied solely upon
impalpable evidence, *see Denson v. State*, 112 Nev. 489, 492, 915
P.2d 284, 286 (1996), closed its mind to the presentation of all
evidence, *see Cameron v. State*, 114 Nev. 1281, 1283, 968 P.2d
1169, 1171 (1998), or refused to consider mitigating evidence, *see
Wilson v. State*, 105 Nev. 110, 115, 771 P.2d 583, 586 (1989).
Accordingly, Patterson has not demonstrated the court abused its
discretion in this regard.  *See Chavez v. State*, 125 Nev. 328, 348,
213 P.3d 476, 490 (2009).[38]

**E.     Patterson's postconviction proceedings**

**1.     *The state district court grants Patterson relief based on judicial bias at
sentencing.***

Patterson filed a pro se petition for writ of habeas corpus in the state district court.  One

ground was that his sentence was unconstitutional in violation of his Fifth and Fourteenth

Amendment rights to due process and a fair trial because the trial court exhibited bias and

contempt toward him.  He claimed that the judge's bias was evident in her remarks that:

- Patterson should have been charged with attempted murder;
- "anarchy and setting people's homes on fire is the most heinous of crimes and
  should be up there with murder";
- arson "is an extraordinarily unusual crime";
- those who commit arson are "extremely dangerous and unusual";
- she'd encountered only two other arson cases in 20 years, including one
  involving a serial murderer;
- Patterson has no "soul," is the "most dangerous of the dangerous," and he
  deserved the maximum sentence because he should not be out in society.

Patterson argued that the judge's remarks presumed that anyone guilty of arson is extremely

dangerous regardless of the circumstances and showed that she ignored any mitigating evidence

for the burglary convictions in his case.  He acknowledged that his arson conviction warranted

---

[38] ECF No. 11-2 at 2–3.

the sentence of 6 to 15 years, but contended that the judge's bias and contempt toward him

caused her to impose maximum consecutive sentences for the three burglaries in spite of

mitigating evidence.  He claimed that the judge's biased beliefs and personal opinions about

arson caused her to impose a maximum sentence that is comparable to that for murder.[39]

Patterson's postconviction counsel filed a supplemental petition incorporating Patterson's

bias claim and adding, "As to [the petition's bias claim], Petitioner contends [that] he received

ineffective assistance of counsel in violation of . . . Constitutional Amendments V, VI, VIII, and

XIV."[40]  Postconviction counsel did not elaborate or provide argument supporting this

conclusory allegation.

The state district court granted Patterson's writ on the bias claim and ordered a new

sentencing hearing, finding "the sentence reflects and the record supports that the court believed

that Petitioner should have been charged with attempted murder, which reveals a level of

intolerable bias":

> Petitioner claims, through Ground 5 of the Petition, that the district
> court committed error during Petitioner's sentencing by expressing
> bias and contempt towards the charge of arson and any individual
> charged and guilty of arson.  Pet. at 25:1–8.  Petitioner asserts that
> the district court characterized arson as "an extraordinarily unusual
> crime" and those who commit arson are "extremely dangerous and
> unusual." *Id.* at 25:10–12.  Petitioner further asserts that the district
> court improperly made comparisons of the crime of arson to the
> crime of attempted murder. *Id.* Petitioner contends that this bias
> caused the district court judge to "assume that anyone guilty of
> arson is extremely dangerous regardless of the circumstances," and
> caused the court to ignore any mitigating evidence. *Id.* at 25:21–
> 26:1.  Petitioner argues that the district court's bias resulted in a
> sentence comparative to a sentence for "multiple counts of
> attempted murder or guilty of First Degree Murder." *Id* at 31:21–
> 24.  During the evidentiary hearing, counsel for Petitioner did not

---

[39] ECF No. 38-22 at 31–37.

[40] ECF No. 39-4 at 4.

present further evidence or argument and indicated that Petitioner
submits Ground Five on the pleadings.

The determination on a claim of bias is "whether considering all
the circumstances alleged, the risk of bias was too high to be
constitutionally tolerable." *Rippo v. State*, 134 Nev. Adv. Op. 53,
423 P.3d 1084, 1101 (2018)(citing *Rippo v. Baker*, 137 S.Ct. 905
(2017)). Petitioner's allegations are based, in part, upon the
district court's commentary relating to the nature of the crime of
arson and the court's comparison of the charge of arson to
attempted murder. At the sentencing hearing in Petitioner's case,
the court asked: "Why isn't this attempted murder . . . You do not
have a soul in this Court's opinion. And you are the most
dangerous of the dangerous, and you deserve the maximum
sentence because you shouldn't be out among society, because this
is the type of criminal that you are." *Sentencing Transcript* at
82:1–12. The court then sentenced Petitioner to the maximum
sentence on each count, and ordered that the sentences run
consecutive to one another. The sentence reflects and the record
supports that the court believed that Petitioner should have been
charged with attempted murder, which reveals a level of
intolerable bias. Accordingly, the Petitioner should be afforded a
new sentencing hearing.[41]

### 2. *The Supreme Court of Nevada reverses, finding that Patterson's claim was procedurally barred.*

On the state's appeal, the Supreme Court of Nevada reversed, finding that the state

district court should never had reached the merits of the claim because it was procedurally

barred:

The State argues that the district court should not have reached the
merits of Patterson's judicial bias claim. Patterson waived the
judicial bias claim by pleading guilty and not raising it on direct
appeal, *Franklin v. State*, 110 Nev. 750, 752, 877 P.2d 1058, 1059
(1994) (holding that "claims that are appropriate for a direct appeal
must be pursued on direct appeal, or they will be considered
waived in subsequent proceedings," including a claim that the
district court was biased), and the claim fell outside the limited
scope of a postconviction habeas petition that challenges a
judgment of conviction based on a guilty plea as set forth in NRS

---

[41] ECF No. 11-3 at 12–13.

34.810(1)(a).  NRS 34.810(1)(a) permits only allegations that the plea "was involuntarily or unknowingly entered" or "was entered without effective assistance of counsel," the latter of which would require Patterson to show a reasonable probability that he would not have pleaded guilty and would have proceeded to trial, *Kirksey v. State*, 112 Nev. 980, 988, 999, 923 P.2d 1102, 1107, 1114 (1996).  Patterson's contention that the State waived this argument by omitting it below fails because the limitation in NRS 34.810(1)(a) is mandatory.  *See* NRS 34.810(1)(a) (providing that the district court "shall dismiss a petition" that challenges a judgment based on a guilty plea and does not raise certain limited claims); *State v. Eighth Judicial Dist. Court (Riker)*, 121 Nev. 225, 231, 112 P.3d 1070, 1074 (2005) (explaining that statutory bars that apply to postconviction habeas petitions are mandatory).  The district court therefore erred in granting relief on the judicial bias claim.

[FN 1] Notably, the Court of Appeals rejected Patterson's challenge to the sentence on direct appeal, concluding that the sentence reflected the evidence presented at the sentencing hearing and that the sentencing judge had not closed her mind to the evidence.  *Patterson v. State*, Docket No. 68043-COA (Order of Affirmance, October 19, 2015); *see also Cameron v. State*, 114 Nev. 1281, 1283, 968 P.2d 1169, 1171 (1998) (recognizing that a judge's remarks in a proceeding do not show bias "unless they show that the judge has closed his or her mind to the presentation of all the evidence").  That decision is the law of the case on those matters.  *Hall v. State*, 91 Nev. 314, 315–16, 535 P.2d 797, 798–99 (1975) (holding that "[t]he law of a first appeal is the law of the case on all subsequent appeals in which the facts are substantially the same" and that "[t]he doctrine of the law of the case cannot be avoided by a more detailed and precisely focused argument" in later proceedings).[42]

## Discussion

**A.    Legal standards**

### *1.    Antiterrorism and Effective Death Penalty Act (AEDPA)*

If a state court has adjudicated a habeas corpus claim on its merits, a federal district court may only grant habeas relief with respect to that claim if the state court's adjudication "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established

---

[42] ECF No. 43-15 at 2–3 n.1.

[f]ederal law, as determined by the Supreme Court of the United States" or "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the [s]tate court proceeding."[43]  A state court acts contrary to clearly established federal law if it applies a rule contradicting the relevant holdings or reaches a different conclusion on materially indistinguishable facts.[44]  And a state court unreasonably applies clearly established federal law if it engages in an objectively unreasonable application of the correct governing legal rule to the facts at hand.[45]  Section 2254 does not, however, "require state courts to *extend*" Supreme Court precedent "to a new context where it should apply" or "license federal courts to treat the failure to do so as error."[46]  The "objectively unreasonable" standard is difficult to satisfy;[47] "even 'clear error' will not suffice."[48]  "The question . . . is not whether a federal court believes the state court's determination was incorrect but whether that determination was unreasonable—a substantially higher threshold."[49]

Habeas relief may only be granted if "there is no possibility [that] fairminded jurists could disagree that the state court's decision conflicts with [the Supreme Court's] precedents."[50] As "a condition for obtaining habeas relief," a petitioner must show that the state-court decision "was so lacking in justification that there was an error well understood and comprehended in

---

[43] 28 U.S.C. § 2254(d).

[44] *Price v. Vincent*, 538 U.S. 634, 640 (2003).

[45] *White v. Woodall*, 572 U.S. 415, 424–27 (2014).

[46] *Id.*

[47] *Metrish v. Lancaster*, 569 U.S. 351, 357–58 (2013).

[48] *Woods v. Donald*, 575 U.S. 312, 316 (2015) (per curiam) (citation omitted).

[49] *Schriro v. Landrigan*, 550 U.S. 465, 473 (2007).

[50] *Harrington v. Richter*, 562 U.S. 86, 102 (2011).

existing law beyond any possibility of fairminded disagreement."[51]  "[S]o long as 'fairminded jurists could disagree' on the correctness of the state court's decision," habeas relief under Section 2254(d) is precluded.[52]  AEDPA "thus imposes a 'highly deferential standard for evaluating state-court rulings,' . . . and 'demands that state-court decisions be given the benefit of the doubt.'"[53]  If a federal district court finds that the state court committed an error under § 2254, the district court must then review the claim de novo.[54]  The petitioner bears the burden of proving by a preponderance of the evidence that he is entitled to habeas relief,[55] but state-court factual findings are presumed correct unless rebutted by clear and convincing evidence.[56]

### 2.  *Ineffective-assistance-of-counsel claims*

The right to counsel embodied in the Sixth Amendment provides "the right to the effective assistance of counsel."[57]  Counsel can "deprive a defendant of the right to effective assistance[] simply by failing to render 'adequate legal assistance[.]'"[58]  In the hallmark case of *Strickland v. Washington*, the United States Supreme Court held that an ineffective-assistance claim requires a petitioner to show that: (1) his counsel's representation fell below an objective standard of reasonableness under prevailing professional norms in light of all of the

---

[51] *Id.* at 103.

[52] *Id.* at 101.

[53] *Renico v. Lett*, 559 U.S. 766, 773 (2010) (citations omitted).

[54] *Frantz v. Hazey*, 533 F.3d 724, 735 (9th Cir. 2008) (en banc) ("[I]t is now clear both that we may not grant habeas relief simply because of § 2254(d)(1) error and that, if there is such error, we must decide the habeas petition by considering de novo the constitutional issues raised.").

[55] *Cullen v. Pinholster*, 563 U.S. 170, 181 (2011).

[56] 28 U.S.C. § 2254(e)(1).

[57] *Strickland v. Washington*, 466 U.S. 668, 686 (1984) (quoting *McMann v. Richardson*, 397 U.S. 759, 771 n.14 (1970)).

[58] *Id.* (quoting *Cuyler v. Sullivan*, 446 U.S. 335, 335–36 (1980)).

circumstances of the particular case;[59] and (2) it is reasonably probable that, but for counsel's errors, the result of the proceeding would have been different.[60]  "The likelihood of a different result must be substantial, not just conceivable."[61]  A petitioner making an ineffective-assistance claim "must identify the acts or omissions of counsel that are alleged not to have been the result of reasonable professional judgment."[62]

A reasonable probability is "probability sufficient to undermine confidence in the outcome."[63]  Review of an attorney's performance must be "highly deferential" and must adopt counsel's perspective at the time of the challenged conduct so as to avoid the distorting effects of hindsight.[64]  "The question is whether an attorney's representation amounted to incompetence under 'prevailing professional norms,' not whether it deviated from best practice or most common custom."[65]  The burden is on the petitioner to "overcome the presumption that, under the circumstances, the challenged action" of counsel "might be considered sound trial strategy."[66]  Ineffective assistance of counsel during a sentencing hearing can result in *Strickland* prejudice because "any amount of [additional] jail time has Sixth Amendment significance."[67]

---

[59] *Strickland*, 466 U.S. at 690.

[60] *Id.* at 694.

[61] *Richter*, 562 U.S. at 112; *Pinholster*, 563 U.S. at 189.

[62] *Strickland*, 466 U.S. at 689–90.

[63] *Williams v. Taylor*, 529 U.S. 362, 390–91 (2000)

[64] *Strickland*, 466 U.S. at 689.

[65] *Richter*, 562 U.S. at 105.

[66] *Strickland*, 466 U.S. at 689.

[67] *Lafler v. Cooper*, 566 U.S. 156, 165 (citation omitted).

3.        *Overcoming default for ineffective-assistance-of-counsel claims*

A petitioner may overcome cause for a procedural default of an ineffective-assistance-of-trial-counsel claim if (1) the claim of "ineffective assistance of trial counsel" is a "substantial" claim; (2) the "cause" consists of there being "no counsel" or only "ineffective" counsel during the state collateral-review proceeding; (3) the state collateral-review proceeding was the "initial review proceeding in respect to the "ineffective-assistance-of-trial-counsel claim"; and (4) "state law *requires* that an 'ineffective assistance of trial counsel [claim] . . . be raised in an initial-review collateral proceeding.'"[68]

To show that a claim is "substantial" under the Supreme Court's opinion in *Martinez v. Ryan*, a petitioner must demonstrate that the underlying ineffectiveness claim has "some merit" and is not "wholly without factual support."[69]  The standard for issuing a certificate of appealability is an analogous standard for determining whether a claim is substantial.[70]  Under that standard, a petitioner must make a "substantial showing of the denial of a constitutional right" and show that "reasonable jurists could debate whether (or, for that matter, agree that) the petition should have been resolved in a different manner or that the issues presented were 'adequate to deserve encouragement to proceed further.'"[71]  This standard does not require a showing that the claim will succeed, only that its proper disposition could be debated among

---

[68] *Trevino v. Thaler*, 569 U.S. 413, 423 (2013) (quoting *Martinez*, 566 U.S. at 14, and relying on *Coleman v. Thompson*, 501 U.S. 722 (1991)).  Nevada prisoners satisfy the requirements (3) and (4) under *Martinez* because they must raise ineffective-assistance-of-counsel claims for the first time in a state petition for postconviction review, which is considered the initial-collateral-review proceeding.  *See Rodney v. Filson*, 916 F.3d 1254, 1259–60 (9th Cir. 2019).

[69] *Martinez*, 566 U.S. at 14–16 (citing *Miller-El v. Cockrell*, 537 U.S. 322 (2003)).

[70] *Id.*

[71] *Miller-El*, 537 U.S. at 336.

25

1  reasonable jurists.[72] That is, the petitioner must be able to make at least some showing that trial

2  counsel's performance was deficient and that the deficient performance harmed the defense.[73]

3  On all such issues, if reached, the federal district court's review is de novo.[74]

4  **4.    *Standards for disqualification of a judge for bias***

5  "The Due Process Clause guarantees a criminal defendant the right to a fair and impartial

6  judge."[75] The Supreme Court has stated that the actual "bias and prejudice" necessary to

7  disqualify a judge "must stem from an extrajudicial source and result in an opinion on the merits

8  on some basis other than what the judge learned from [her] participation in the case."[76] The

9  Supreme Court has also stated, however, that the Fourteenth Amendment's due-process clause

10 may sometimes demand recusal even when a judge has no actual bias.[77] "Recusal is required

11 when, objectively speaking, 'the probability of actual bias on the part of the judge or

12 decisionmaker is too high to be constitutionally tolerable.'"[78] "A favorable or unfavorable

13

---

14 [72] *Id.* at 336–38.

15 [73] *Strickland*, 466 U.S. at 687–88, 694.

   [74] *Visciotti v. Martel*, 862 F.3d 749, 769 (9th Cir. 2016).

16 [75] *Hurles v. Ryan*, 188 F. Supp. 3d 907, 916 (D. Ariz. 2016) (citing *In re Murchison*, 349 U.S.
17 133, 136 (1955), and *Rhoades v. Henry*, 598 F.3d 511, 519 (9th Cir. 2010) ("Due process
   requires that trials be conducted free of actual bias as well as the appearance of bias.")).

18 [76] *United States v. Grinnell Corp.*, 384 U.S. 563, 583 (1966) (citing *Berger v. United States*, 255
   U.S. 22, 31 (1921)); *see also Kirksey v. State*, 923 P.2d 1102, 1119 (Nev. 1996) (stating that
19 "[a]n opinion formed by a judge on the basis of facts introduced or events occurring in the course
   of the current proceedings, or of prior proceedings, constitutes a basis for a bias or partiality
20 motion where the opinion displays 'a deep-seated favoritism or antagonism that would make fair
   judgment impossible.'") (quoting *Liteky v. United States*, 510 U.S. 540, 555 (1994)); *Whitehead*
21 *v. Nevada Com'n on Judicial Discipline*, 873 P.2d 946, 976 n.45 (Nev. 1994).

   [77] *Rippo v. Baker*, 580 U.S. 285, 287 (2017).

22 [78] *Id.* (citing *Withrow v. Larkin*, 421 U.S. 35, 47 (1975) and *Williams v. Pennsylvania*, 579 U.S.
23 1, 8 (2016) ("The Court asks not whether a judge harbors an actual, subjective bias, but instead
   whether, as an objective matter, the average judge in his position is likely to be neutral, or
   whether there is an unconstitutional potential for bias.") (internal quotation marks omitted)).

predisposition can also deserve to be characterized as 'bias' or 'prejudice' because, even though it springs from the facts adduced or the events occurring at trial, it is so extreme as to display clear inability to render fair judgment."[79]

A petitioner can prevail on a claim of judicial bias only if he overcomes the "strong presumption that a judge is not biased or prejudiced."[80]  "[J]udicial remarks during the course of a trial that are critical or disapproving of, or even hostile to, counsel, the parties, or their cases, ordinarily do not support a bias or partiality challenge."[81]  "They *may* do so if they reveal an opinion that derives from an extrajudicial source; and they *will* do so if they reveal such a high degree of favoritism or antagonism as to make fair judgment impossible."[82]  Judicial bias is a structural defect when actual or unconstitutionally probable; if either type is proven, prejudice need not be proven.[83]

---

[79] *Id.*

[80] *Sivak v. Hardison*, 658 F.3d 898, 924 (9th Cir. 2011) (citing *Rhoades*, 598 F.3d at 519) (citing *Bracy v. Gramley*, 520 U.S. 899, 909 (1997) ("Ordinarily, we presume that public officials have 'properly discharged their official duties.'")).

[81] *Liteky*, 510 U.S. at 555–56; *see, e.g.*, *Rhoades*, 598 F.3d at 518–19 (holding that a judge's statements characterizing a defendant as "'morally vacant and totally devoid of conscience,' had a propensity to commit murder, constituted a continuing threat to society, and had committed an offense that was 'extremely wicked and vile[ ] [and] shockingly evil,'" when made in the course of sentencing the defendant in one murder case, did not require the judge to recuse himself from sentencing the defendant in a separate murder case three weeks later).

[82] *Id.*

[83] *See Weaver v. Massachusetts*, 582 U.S. 286, 294–95 (2017) ("The purpose of the structural error doctrine is to ensure insistence on certain basic, constitutional guarantees that should define the framework of any criminal trial.  Thus, the defining feature of a structural error is that it 'affect[s] the framework within which the trial proceeds,' rather than being 'simply an error in the trial process itself.'"); *Williams v. Pennsylvania*, 579 U.S. 1, 14 (2016) (holding that an unconstitutional failure to recuse constitutes structural error even if the judge in question did not cast a deciding vote); *Arizona v. Fulminante*, 499 U.S. 279, 309–10 (1991) (acknowledging that judicial bias is a structural defect not subject to harmless-error analysis); *see also Greenway v. Schriro*, 653 F.3d 790, 806–07 (9th Cir. 2011) (stating judicial bias "is structural error that requires automatic reversal").

Nevada judges are afforded wide discretion in imposing a sentence.  "This discretion enables the sentencing judge to consider a wide, largely unlimited variety of information to insure that the punishment fits not only the crime, but also the individual defendant."[84]  A trial judge may consider hearsay and "is privileged to consider facts and circumstances which clearly would not be admissible at trial," including, "[o]ther criminal conduct" that the defendant committed, even if the defendant was never charged with or convicted of it . . . ."[85]  The Supreme Court of Nevada "has repeatedly declined to interfere with sentencing when the sentence is legal and within the statutory limits" and if it cannot be shown that the sentencing court "relied on highly suspect or impalpable evidence."[86]  But a judge's remarks made during a court proceeding may also indicate prejudice or improper bias if they demonstrate "the judge has closed his or her mind to the presentation of all the evidence."[87]  "The burden is on the party asserting the challenge to establish sufficient facts warranting disqualification."[88]

**B.  *Patterson is not entitled to habeas relief for ground one.***

Ground one of the petition alleges that trial counsel rendered ineffective assistance in violation of the Sixth and Fourteenth Amendments throughout the proceedings, and in particular

---

[84] *Martinez v. State*, 961 P.2d 143, 145 (Nev. 1998) (citations omitted).

[85] Nev. Rev. Stat. § 47.020(3)(c); *Silks v. State*, 545 P.2d 1159, 1161 n.2 (Nev. 1976) (citing *United States v. Weston*, 448 F.2d 626, 633 (9th Cir. 1971)).

[86] *Cameron v. State*, 968 P.2d 1169, 1171 (Nev. 1998) (citing *Lloyd v. State*, 576 P.2d 740 (Nev. 1978); *Silks*, 545 P.2d 1159)); *see, e.g.*, *Norwood v. State*, 915 P.2d 277, 278–79 (Nev. 1996) (granting new penalty hearing after sentencing court imposed sentence within statutory limits but in excess of that recommended by the state, immediately after the court's unsubstantiated declaration that it believed defendant was a gang leader even though there was no evidence to support that conclusion, gang affiliation was not at issue, and there was no reference to gangs at trial).

[87] *Cameron*, 968 P.2d at 1171 (citing Canon 3(B)(5) of the Nevada Code of Judicial Conduct and Jeffrey M. Shaman et al., *Judicial Conduct and Ethics* § 4.07, at 105 (2d ed. 1995)).

[88] *Kirksey*, 923 P.2d at 1118 (citation omitted).

28

alleges that trial counsel failed to object to—or moved to disqualify based on—the judge's and the prosecutor's statements during sentencing.  I divide ground one into three parts: (1A) ineffectiveness for failing to object or move to disqualify the sentencing judge for her comments equating arson with the most dangerous crimes, including murder: (1B) ineffectiveness for failing to object or move to disqualify the sentencing judge for her comments characterizing Patterson as a sociopath and interpreting his tattoos to support that conclusion; and (1C) ineffectiveness for failing to object to the prosecutor's remarks.  I divide 1A and 1B because I find that while 1A overcomes procedural default, 1B does not, requiring different analyses for each portion.  And I consider 1C separately because it concerns the conduct of the prosecutor, not the sentencing judge.

1.   ***Ground 1A—failure to object or move to disqualify the judge based on remarks about arson, attempted murder, and murder***

a.   ***Patterson has shown cause and prejudice sufficient to overcome the procedural bar on ground 1A.***

In Patterson's state postconviction review proceeding, the state district court determined that his sentencing judge believed Patterson should have been charged with attempted murder, and that those circumstances revealed a level of intolerable bias that entitled Patterson to a new sentencing hearing.  Although the state district court's grant of relief was reversed because of an independent state procedural bar, the decision granting the merits of Patterson's claim of judicial bias establishes there is some merit to a motion to disqualify the sentencing judge.  Accordingly, Patterson has established that his claim that trial counsel was ineffective under *Strickland* for failing to move to disqualify the sentencing judge for bias based on the judge's remarks equating arson to attempted murder is substantial.

1       I also find that postconviction counsel's performance was deficient and prejudicial under

2   *Strickland*.  In Patterson's pro se petition for state postconviction relief, he claimed that the

3   sentencing judge's remarks about arson, attempted murder, and murder indicated that the judge

4   showed bias when she imposed the maximum sentence on his separate burglary convictions.

5   Although postconviction counsel raised a conclusory ineffective-assistance-of-counsel claim

6   based on Patterson's pro se bias claim, postconviction counsel's performance was deficient in

7   that she failed to "identify the acts or omissions of [trial] counsel that are alleged not to have

8   been the result of reasonable professional judgment."[89]  An objectively reasonable

9   postconviction-review attorney, whose aim is to allege reviewable claims of ineffective

10  assistance of counsel in a state postconviction review proceeding, would have researched

11  disqualification of a judge for bias following sentencing in Nevada and identified the acts or

12  omissions of trial counsel that were alleged not to have been the result of reasonable professional

13  judgment to support the ineffective-assistance-of-trial-counsel claim.  Here, postconviction

14  counsel merely added a conclusory sentence that vaguely asserted an ineffective-assistance claim

15  with no detail or analysis to show the court how trial counsel was ineffective.  So I find that

16  Patterson has established cause and prejudice to overcome procedural default.

17            **b.**     **Patterson has not shown that trial counsel was ineffective for failing**
18                  **to object or move to disqualify the judge based on her arson and murder**
                **statements.**

19      Because Patterson has established cause and prejudice to excuse the procedural default of

20  ground 1A, I next review de novo his claim that trial counsel was ineffective for failing to move

21  to disqualify the sentencing judge for bias based on the judge's remarks about arson, murder, and

22

23

---

[89] *Strickland*, 466 U.S. at 689–90.

1  attempted murder.[90]  I ultimately find that Patterson fails to establish deficient performance

2  under *Strickland*.[91]

3        The defense presented mitigating evidence at Patterson's sentencing, including

4  Patterson's difficult upbringing, substance-abuse, acceptance of responsibility, and cooperation

5  with police to return the property he stole.  The sentencing judge confirmed that she

6  "[c]onsidered all the mitigating factors" presented to her.  The testimony of Patterson and trial

7  counsel at the postconviction evidentiary hearing demonstrates that trial counsel believed, as a

8  matter of strategy, that it was best not to interrupt the judge's sentencing remarks with objections

9  because the remarks did not necessarily mean that the outcome would be unfavorable.[92]  Given

10  trial counsel's extensive experience with sentencing hearings before this particular judge, that

11  was an objectively reasonable strategy at the time.[93]

12        Trial counsel could reasonably conclude that the judge's remarks questioning why

13  Patterson wasn't charged with attempted murder were intended to show that she heard and

14  understood the Drews' testimony expressing bewilderment that he wasn't charged with more

15  serious crimes.  It is also reasonable to conclude that those remarks stopped short of agreement

16  that Patterson should have been charged or convicted of committed attempted murder.  Thus,

17

18

---

19  [90] *See Pirtle v. Morgan,* 313 F.3d 1160, 1167–68 (9th Cir. 2002).

20  [91] Patterson claims that the state district court's finding on the merits of the claim underlying this
    *Strickland* claim control the resolution of the *Strickland* claim.  ECF No. 62 at 15.  Patterson's

21  citation to *Juan H. v. Allen,* 408 F.3d 1262, 1273 (9th Cir. 2005), does not support this position.
    Rather, in *Juan H.*, the Ninth Circuit held that a prior finding that a substantive claim had no

22  merit controlled whether counsel was ineffective.

    [92] ECF No. 41-1 at 51, 68, 99–103.

23  [93] *Id.* at 62–64 (trial counsel testifying at Patterson's postconviction hearing that he'd represented
    hundreds of clients over seven years in sentencing hearings before Patterson's sentencing judge).

counsel could reasonably conclude that the remark did not indicate that the judge sentenced Patterson as if he had committed attempted murder or that she imposed a sentence based on bias.

Trial counsel could reasonably conclude that evidence at sentencing supported the court's remarks admonishing Patterson for putting firefighters, first responders, and the people he'd burglarized at risk, noting that arson was a pastime of Patterson's, and calling him "the most dangerous of the dangerous." Patterson lit two fires and attempted to light a third fire during his 19-burglary spree. After initially denying that he set fire to the Drews' garage because "there could be kids in there," he later acknowledged that he knew people were inside the Drews' house but torched it anyway. He also listened to a police scanner to avoid detection, suggesting that he could have known that no one called in the arson for at least ten minutes, leaving the fire to burn and potentially harm the people in the house without warning those inside. Through the Drews' victim-impact statements, the judge heard evidence of the damage the fire caused and that the firefighters responding to the fire had to put themselves at risk to save the Drews and their home. That evidence certainly supports the conclusion that Patterson was aware that his actions could cause injury or death, but lit fires anyway, and lit them repeatedly.

Trial counsel could also reasonably conclude that the sentencing judge did not evince bias about arson in general. The circumstances presented by the evidence and the judge's experience supported the court's remarks that arson is "an extraordinarily unusual crime" that "involves extremely dangerous and unusual people," including a previous defendant that the judge characterized as a "serial murderer." Patterson admitted to committing a crime that he knew could result in the death or injury of an unknown number of people. He caused a situation that risked the lives of the people he burglarized and the first responders who would be called to mitigate the damage he caused. And the judge explained that her sentence was based on the

nature of Patterson's crimes and the fact that they were part of an extended crime spree. Reasonable counsel could conclude that the judge's cumulative consideration of the evidence describing Patterson's 19 burglaries, three of which included arson and several of which involved stealing and selling firearms, supported the judge's imposition of the maximum sentence for his burglary convictions.

So I find, on de novo review, that Patterson fails to establish that trial counsel's performance was deficient in failing to object or move to disqualify the judge for bias based on the sentencing judge's remarks about arson, murder, and attempted murder, and the dangerous nature of Patterson's crimes. As the Supreme Court put it in *Liteky v. United States*, a judge "may, upon completion of the evidence, be exceedingly ill disposed towards [a] defendant[] who has been shown to be a thoroughly reprehensible person."[94] Even so, the judge is not recusable for bias or prejudice if her negative opinion was "properly and necessarily acquired in the course of the proceedings."[95] Patterson's sentencing judge's remarks did not suggest reliance on facts that were extrajudicial, highly suspect, or impalpable. An objectively reasonable attorney could instead conclude that the judge's remarks were based on the evidence presented at sentencing showing that Patterson was a dangerous criminal with little regard for the safety and property of others. But because reasonable jurists could debate the correctness of this decision, I issue a certificate of appealability for ground 1A.

---

[94] *Liteky*, 510 U.S. at 550–51.

[95] *Id.* at 551.

### 2. Ground 1B—failure to object or move to disqualify the judge based on remarks characterizing Patterson as a sociopath and disparaging his tattoos

Patterson alleges that trial counsel was ineffective in failing to object or move to disqualify the judge for bias based on the judge's remarks that Patterson appeared to be a "sociopath" without a "conscience" or a "soul," and her comment that his tattoos appeared to support those conclusions. I find that Patterson cannot establish a substantial claim that trial counsel's performance was deficient under *Strickland* on this basis. Accordingly, I find Patterson fails to establish cause and prejudice under *Martinez* sufficient to overcome the procedural default of his claim of ineffective assistance of trial counsel.

I find insubstantial Patterson's claim that trial counsel was ineffective in failing to object and argue that the mental-health evaluation contradicted the judge's remarks characterizing Patterson as a sociopath. Patterson told the mental-health evaluator that he was previously diagnosed with conduct disorder. The evaluation included conduct disorder as a diagnosis but also states, "rule out anti-social personality disorder." The evaluator's "rule-out" statement is ambiguous on its face. All reasonable jurists would agree that an objectively reasonable trial attorney could conclude that the "rule-out" language in the evaluation means a diagnosis of anti-social personality order could not be ruled out without further evaluation and did not affirmatively rule it out as diagnosis.[96] Accepting as true Patterson's argument that it is impossible to simultaneously diagnose an individual with conduct disorder and anti-social personality disorder, the evaluation does not foreclose a diagnosis for anti-social personality disorder; another evaluation could conclude that Patterson suffers from anti-social personality

---

[96] *See Jackson v. Berryhill*, 694 F. App'x 39, 41 (2d Cir. 2017) (noting that "rule out" diagnoses "indicated that the disorders were possible diagnoses that had not been ruled out, pending further evaluation.").

disorder (and not conduct disorder) on further review.  So Patterson fails to substantiate his claim that trial counsel provided ineffective assistance by failing to object to the remarks as contradicted by the mental-health evaluation.

I also find that Patterson fails to establish a substantial claim that trial counsel's failure to object or move to disqualify the judge based on her remarks that Patterson appears to be a sociopath without conscience or a soul is deficient under *Strickland*.  The sentencing judge stated that the maximum sentence was warranted for the nature of the crimes and the nature of Patterson's crime spree.  An objectively reasonable attorney could conclude that the sociopath remark was based on facts and circumstances the judge learned through her participation in the case, including the number and seriousness of the charged and uncharged crimes, the victim-impact statements, the unusual combination of burglary and arson, Patterson's acknowledgement that he knew he'd put people's lives at risk, and Patterson's statements to his girlfriend indicating his efforts to engineer favorable mental-health or substance-abuse evaluations.  Plus, the judge sentenced Patterson within the statutory limits—which he agreed to in his plea memorandum— and the record shows that the judge did not close her mind to the presentation of all evidence, including mitigation evidence.  Reasonable jurists would agree that, based on the circumstances, an objectively reasonable attorney could conclude that the judge's remarks were grounded in the evidence presented at sentencing and did not rely on facts that were extrajudicial, highly suspect, impalpable, or that arose from a deep-seated antagonism that would make fair judgment impossible.[97]

---

[97] Patterson's reliance on *Commonwealth v. Williams*, 69 A.3d 735, 748-49 (Pa Super. Ct. 2013), is misplaced.  There, the sentencing judge did not state the defendant *appeared* to be a "pathological liar" and a "classic sociopath"; rather, the *Williams* court repeatedly described the defendant as such with no evidence to support either characterization.

Reasonable jurists would also agree that an objectively reasonable attorney would find no legal or factual basis to object to the court's recitation of some of Patterson's tattoos as listed in the PSI, or move to disqualify the judge based on her tattoo-related comments.  Patterson claims that counsel should have objected to the court's negative inferences, sought to correct her incorrect impressions, and argued that the judge's remarks violated Patterson's free-speech rights.  But, given the nature of the tattoos, objecting to the court's recitation of the tattoos or requesting an opportunity to explain them would call undue attention to them, and in particular the "anarchy" tattoo, for which Patterson offered no interpretation during the postconviction evidentiary hearing that was at odds with the common and ordinary meaning of the word.[98]  Nor could any reasonable jurist conclude that the judge sentenced Patterson for the ideas that she believed his tattoos expressed in violation of the First Amendment.  Patterson's trial counsel had appeared before this particular judge in hundreds of cases over a number of years.  Counsel stated that he did not think the tattoos caused the judge to impose a harsher sentence—that result was instead driven by the victim-impact statements.  And the judge explained that Patterson's long sentence was a reflection of the nature and extent of his crimes; she did not directly rely on her interpretation of Patterson's tattoos.  So I find that trial counsel's failure to object or seek recusal of the judge based on her characterization of Patterson as a sociopath and interpreting his tattoos in a negative light does not show a substantial ineffective-assistance claim.

### 3.    Ground 1C—failure to object to the prosecutor's remarks

Patterson alleges that trial counsel was ineffective in failing to object to the prosecutor's request that the court "send a message" to other offenders with Patterson's sentence.

---

[98] *See* ECF No. 41-1 at 41–45 (Patterson testified at his postconviction evidentiary hearing about the meanings behind most of his tattoos).

Respondents contend that the prosecutor's argument was proper and Patterson fails to overcome

the procedural default of this claim.  I find that Patterson cannot establish a substantial claim of

deficient and prejudicial performance under *Strickland* and therefore fails to establish cause and

prejudice to overcome the procedural default of this portion of ground one.

At sentencing, the prosecutor argued that the court should consider sending a message

that people who commit crimes like this "will be dealt with harshly":

> So I would submit, your Honor, for him punishment and
> incapacitation loom the largest in terms of consideration for
> sentencing.  And the sentence should send a message not just to
> him, but it should send a message.  He's not the only serial burglar
> that we've had in Washoe County.  He is certainly not the last.
> Unfortunately, we've had a rash of them, we all know, from seeing
> media accounts.  Even after these individuals that are part of this
> case were caught, there were other, sort of rashes of burglaries that
> continue.  So I submit, your Honor, this sentence should send a
> message to people across the community that individuals that
> engage in this type of conduct, not just going into one person's
> house or car, going in and stealing their stuff, but people who are
> repetitively doing it over time, for whatever reason, that they will
> be dealt with harshly.[99]

The Supreme Court of Nevada has acknowledged that "[p]unishment by imprisonment is

generally accepted as serving three moral and social purposes: retribution, deterrence of

prospective offenders, and segregation of offenders from society."[100]  "Deterrence also has a

rational and historically accepted legitimacy in determining the degree of punishment called for

in a given criminal conviction."[101]  Here, reasonable jurists would agree that an objectively

reasonable trial attorney is aware that sentencing judges may consider deterrence so long as the

---

[99] ECF No. 37-20 at 62.

[100] *Naovarath v. State*, 779 P.2d 944, 947 (Nev. 1989).

[101] *Id.*

37

1    sentence is not motivated by the desire for general deterrence to the exclusion of adequate

2    consideration of individual factors.[102]  Given that the judge said nothing to indicate that

3    Patterson's sentence was motivated by anything other than the seriousness and nature of the

4    charged and uncharged crimes, and the court imposed a sentence within the parameters of the

5    plea memorandum and statutes of conviction, I conclude that all fairminded jurists would agree

6    that trial counsel's failure to object to the prosecutor's argument was objectively reasonable

7    under the circumstances.[103]  So I find that Patterson fails to establish cause and prejudice

8    sufficient to overcome the procedural default of his claim of ineffective assistance of trial

9    counsel based on counsel's failure to object to the prosecutor's deterrence remarks.

10   **C.      Patterson is not entitled to habeas relief for ground three.**

11            Ground three alleges that trial counsel was ineffective for allowing Patterson's self-

12   reported juvenile criminal history (which reflected two prior acts of arson) to appear in the

13   mental-health evaluation given to the sentencing judge, without counsel first investigating the

14   details of those crimes and preparing to address them in context at sentencing.  Patterson claims

15   that trial counsel should have either objected to the history being considered, or requested a

16   meaningful opportunity to address it.  Respondents contend that Patterson has not established

17   that counsel's performance was deficient or that he was prejudiced under *Strickland*.[104]

18

---

[102] *See United States v. Barker*, 771 F.2d 1362, 1369 (9th Cir. 1985).

[103] Patterson's reliance on *United States v. Sanchez*, 659 F.3d 1252, 1257 (9th Cir. 2011), is misguided.  *Sanchez* holds that prosecutors are prohibited from urging juries to convict a defendant in order to deter others from committing crimes because such arguments urge the jury to convict "for reasons wholly irrelevant" to a defendant's guilt or innocence.  *Id.*  By contrast, one purpose of sentencing is to "deter similar misconduct by others."  *Barker*, 771 F.2d 1362 (9th Cir. 1985) ("This doctrine, commonly called 'general deterrence,' boasts an impressive lineage, was long-recognized at common law, and continues to command near unanimity among state and federal jurists." (cleaned up)).

[104] ECF Nos. 16 at 15-17, 20; 55 at 44–45.

1    When it considered this argument, the Supreme Court of Nevada held that Patterson

2  failed to show deficient performance or prejudice:

>       Patterson argues on cross-appeal that trial counsel should have
>       discussed his juvenile record more effectively during the
>       sentencing hearing and should have objected to the sentencing
>       court's references to his juvenile offenses.  These claims likewise
>       fell beyond the scope of claims permitted in a postconviction
>       habeas petition challenging a judgment of conviction based on a
>       guilty plea as stated in NRS 34.810(1)(a).  Moreover, Patterson
>       failed to show deficient performance or prejudice on these claims.
>       *See Strickland v. Washington*, 466 U.S. 668, 687–88 (1984)
>       (providing standard for ineffective assistance of counsel claims);
>       *Warden v. Lyons*, 100 Nev. 430, 432–33, 683 P.2d 504, 505
>       (1984).  Substantial evidence supports the district court's finding
>       that trial counsel's approach to Patterson's juvenile record
>       reflected a strategic decision to present Patterson's past misdeeds
>       and subsequent efforts at rehabilitation to humanize him, and
>       Patterson has not shown extraordinary circumstances to question
>       counsel's strategic decision.  *See Lader v. Warden*, 121 Nev, 682,
>       686, 120 P.3d 1164, 1166 (2005) (deferring to the district court's
>       factual findings that are supported by substantial evidence and not
>       clearly wrong but reviewing its application of the law to those facts
>       de novo); *Lara v. State*, 120 Nev. 177, 180, 87 P.3d 528, 530
>       (2004)  "[T]rial counsel's strategic or tactical decisions will be
>       virtually unchallengeable absent extraordinary circumstances."
>       (internal quotation marks omitted)).  Trial counsel also testified
>       that he did not know of any basis for an objection, and Patterson
>       has not identified any authority suggesting that the district court's
>       comments were in error.  *See Thomas v. State*, 88 Nev. 382, 385,
>       498 P.2d 1314, 1316 (1972) (concluding that sentencing judge did
>       not err in considering appellant's juvenile record).  The district
>       court therefore did not err in denying these claims.[105]

19  That determination that trial counsel's performance was not deficient or prejudicial under

20  *Strickland* was objectively reasonable.  The Supreme Court of Nevada has held that juvenile-

21  criminal records may be considered at sentencing.[106]  Counsel testified at the postconviction

---

[105] ECF No. 11-4 at 3–4.

[106] *See Thomas v. State*, 498 P.2d 1314, 1316 (Nev. 1972).

39

1  evidentiary hearing that he didn't object to the inclusion of Patterson's juvenile criminal history

2  as part of a strategic decision to show that Patterson owned up to his past mistakes and was now

3  trying to do better.[107]  Patterson has not shown that this strategy was objectively unreasonable or

4  that trial counsel failed to investigate and uncover any details concerning the juvenile arrests that

5  would have changed the outcome of the sentencing proceeding.  So I find that counsel's

6  performance in this regard was not deficient.

7         There is also no reasonable probability that, but for counsel's presentation of Patterson's

8  juvenile record, his sentence would have been different.  The state indicated in its sentencing

9  proffer that Patterson admitted in his police interview that he had committed arson when he was

10  younger.  Patterson's statement to the mental-health evaluator that he was twice arrested for

11  arson when he was a juvenile was consistent with that statement to police.  Although the

12  sentencing judge asked defense counsel for details concerning the juvenile arrests for arson, the

13  sentencing judge's remarks about Patterson setting fires "over and over" was made in the context

14  of discussing his recent string of burglaries with his "buddies," during which, as the state argued,

15  he set fire to the Drews' garage and a parked vehicle after burglarizing them.

16         Under the circumstances, the Supreme Court of Nevada's determination is neither

17  contrary to, nor constitutes an unreasonable application of, clearly established federal law as

18  determined by the Supreme Court, and it was not based on an unreasonable determination of the

19  facts in light of the evidence presented in the state-court proceeding.  Accordingly, Patterson is

20  not entitled to federal habeas corpus relief for ground three.

21

22

23

---

[107] ECF No. 41-1 at 82–83.

**D.     On the whole, trial counsel's conduct was not deficient.**

In *Browning v. Baker*, the Ninth Circuit held that, "[w]hile an individual claiming [ineffective assistance of counsel] 'must identify the acts or omissions of counsel that are alleged not to have been the result of reasonable professional judgment,'" courts must "consider[] counsel's conduct *as a whole* to determine whether it was constitutionally adequate."[108]  I divided Patterson's ineffective-assistance claims based on Patterson's grounds for relief and because some portions of ground one required an analysis of the facts at different procedural postures.  But assuming that Patterson could overcome the procedural defaults that plague some of his claims and I could consider the merits of his ineffective-assistance claims as a whole, I come to the same conclusion: an objectively reasonable trial attorney could conclude that the judge's remarks, the prosecutor's comments, and the admission of Patterson's juvenile criminal history were not objectionable.

The judge's remarks were based on her experience and the circumstances presented at trial.  The prosecution is permitted to argue for a sentence that deters the criminal conduct of others.  Judges are permitted to consider a defendant's juvenile criminal history, and trial counsel explained and downplayed that history when the judge inquired about it.  Viewing the record as a whole, I find that Patterson has not shown that his trial counsel's performance was deficient or prejudicial under *Strickland*.  So I deny his petition for a writ of habeas corpus.

**E.     Certificate of Appealability**

The right to appeal from the district court's denial of a federal habeas petition requires a certificate of appealability.  To obtain that certificate, the petitioner must make a "substantial

---

[108] *Browning v. Baker*, 875 F.3d 444, 471 (9th Cir. 2017).

showing of the denial of a constitutional right."[109]  If "a district court has rejected the constitutional claims on the merits," that showing "is straightforward: The petitioner must demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong."[110]  But because the state postconviction court found that Patterson's judicial-bias claim had merit, I issue a certificate of appealability for grounds one and three because jurists of reason could debate the correctness of my analysis.

## Conclusion

IT IS THEREFORE ORDERED that the petition **[ECF No. 16] is DENIED**.  And because reasonable jurists could find my decision to deny this petition to be debatable or wrong, a **certificate of appealability is GRANTED on grounds one and three**.

IT IS FURTHER ORDERED that the Clerk of Court is directed to **substitute Brian Williams for Respondent Calvin Johnson**.

IT IS FURTHER ORDERED that the Clerk of Court is directed to **ENTER JUDGMENT accordingly and CLOSE THIS CASE**.

_____
U.S. District Judge Jennifer A. Dorsey
September 27, 2023

---

[109] 28 U.S.C. § 2253(c).

[110] *Slack v. McDaniel*, 529 U.S. 473, 484 (2000); *see also James v. Giles*, 221 F.3d 1074, 1077–79 (9th Cir. 2000).